UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PENNY HART, | COMPLAINT |
| Plaintiff, | |
| - v - | Civil Action No.: __1:21-cv-1738__ |
| THE TRI-STATE CONSUMER, INC., WT HOLDINGS, INC., and CHARLES SLATERY, | *Presiding Judge to be determined upon judicial assignment* |
| Defendant(s). | JURY TRIAL DEMANDED |

Plaintiff Penny Hart ("Plaintiff" or "Ms. Hart"), by and through her attorneys, Duke Holzman Photiadis & Gresens LLP, as and for her complaint against Defendants The Tri-State Consumer, Inc. ("Tri-State"), WT Holdings, Inc. ("WT Holdings"), and Charles Slatery (each a "Defendant" and collectively "Defendants"), alleges upon knowledge as to herself, and upon information and belief as to all other matters, as follows:

INTRODUCTION

1.      This action arises from Defendants' intimidation tactics and fraudulent inducement of Ms. Hart into: (a) resigning her position as President and CEO of Defendant Tri-State; and (b) selling her ownership interests in Tri-State.

2.      Defendants engaged in the fraudulent conduct for, *inter alia*, the purpose of circumventing Ms. Hart's various rights as a shareholder and officer of Tri-State, including, but not limited to: (a) her right of first refusal; (b) right to remain a board member of Tri-State during the duration of her employment; and (c) right to an independent fair-market valuation of her Tri-State shares and compulsory buyout of her ownership interest at fair market value.

## THE PARTIES

3.      Plaintiff Penny Hart is a natural person, who at all relevant times was and is a resident of the State of New York, County of Westchester.

4.      Upon information and belief, Defendant Charles Slatery is a natural person who at all relevant times was and is a resident of the State of Tennessee.

5.      Upon information and belief, Defendant WT Holdings was and is a corporation organized and existing under the laws of the State of Tennessee, with its principal place of business located at 510 South Mendenhall Road, Suite 200, Memphis, Tennessee 38117.

6.      Upon information and belief, at all relevant times Mr. Slatery was and is CEO and Chairman of the Board of Directors of WT Holdings.

7.      Upon information and belief, Defendant Tri-State was and is a corporation organized and existing under the laws of the State of New York, with its principal place of business located at 100 Jericho Quadrangle, Suite 124, Jericho, New York 11753.

8.      Upon informant and belief, at all relevant times Tri-State was and is the owner of non-party Tri-State Consumer Insurance Company ("TSC Insurance"), which was and is an insurance company organized under the laws of, and duly authorized to transact insurance business in, the State of New York.

9.      Upon information and belief, at all relevant times WT Holdings was and is the majority owner of Tri-State.

10.     Upon information and belief, at all relevant times herein, Mr. Slatery served as the Chairman of the Board and Executive Vice President of Tri-State.

11.     Upon information and belief, WT Holdings wholly owns non-party Stillwater Property and Casualty Insurance Company ("Stillwater").

12.     Upon information and belief, Mr. Slatery is owner and an officer of non-party NFC Investments, LLC ("NFC Investments"), which manages various investment portfolios for TSC Insurance and Stillwater, which combined, total several hundred million dollars of investments.

13.     Upon information and belief, at all relevant times, pursuant to his positions, Mr. Slatery controlled Tri-State, WT Holdings and its subsidiary Stillwater, and the firm that manages their investment portfolios, NFC Investments.

14.     Upon information and belief, after Ms. Hart was forced to resign as President and CEO of Tri-State, Mr. Slatery obtained total control of Tri-State.

<u>JURISDICTION AND VENUE</u>

15.     This Court has jurisdiction pursuant to Section 27 of the Securities and Exchange Act (15 USCS § 78aa(a)), 28 U.S.C. § 1331, and 28 U.S.C. § 1367.

16.     Venue is proper in this District pursuant to Section 27 of the Securities and Exchange Act (15 USCS § 78aa(a)) and 28 U.S.C. § 1391.

<u>FACTUAL BACKGROUND</u>

I.     <u>General Overview</u>

17.     Tri-State was formed in or about 1974 as a holding company.

18.     From 1992 through 2008, Ms. Hart and her brother collectively owned one hundred percent (100%) of the outstanding stock of Tri-State.

19.     By and through their ownership of Tri-State, Ms. Hart and her brother also owned and controlled Tri-State's various wholly-owned subsidiary(ies), including TSC Insurance.

20.     In 2008, Ms. Hart and her brother sold their combined one hundred percent (100%) ownership interest in Tri-State to Defendant WT Holdings.

21.     Notwithstanding, WT Holdings chose to retain Ms. Hart as the President and CEO of Tri-State, so that she could, among other things, continue to manage and oversee the operations of Tri-State's various insurance-related, wholly-owned subsidiaries—including TSC Insurance.

22.     Two years later, in or around August 2010, Ms. Hart re-purchased three percent (3%) of the outstanding stock of Tri-State from WT Holdings.

23.     Accordingly, following that stock purchase, Ms. Hart was a three percent (3%) shareholder and owner of Tri-State, and simultaneously continued as its President and CEO.

24.     Meanwhile, WT Holdings was a ninety-seven percent (97%) shareholder and owner of Tri-State, and WT Holdings' President, CEO, and Chairman of the Board of Directors, Charles Slatery, was appointed as the Executive Vice President of Tri-State.

25.     In the approximate thirteen (13) years under Ms. Hart's leadership and guidance as President and CEO, Tri-State thrived, resulting in approximately $50 million dollars of dividends being distributed to Tri-State's shareholders.

II.     Ms. Hart's efforts as President and CEO resulted in multiple third-party offers to purchase Tri-State

26.     On or around December 10, 2018, an entity known as Standard Diversified entered into an agreement with Tri-State to purchase all, or substantially all, of Tri-State's then-current holdings.

27.     Accordingly, Tri-State, specifically Ms. Hart on behalf of Tri-State, and WT Holdings engaged in months of exhaustive due diligence to vet the details of the potential purchase; however, ultimately the parties were unable to consummate a deal.

28.     While Tri-State and its majority shareholder, WT Holdings, desired to pursue the deal, Standard Diversified withdrew its interest and offer.

29.     Shortly after that purchase offer fell through, Hal Belodoff of Plymouth Rock Assurance approached Mr. Slatery and informed him that Plymouth Rock Assurance would be interested in purchasing Tri-State.

30.     Yet again, WT Holdings was willing to entertain the purchase offer; thus, Tri-State, specifically Ms. Hart on behalf of Tri-State, and WT Holdings began another round of exhaustive due diligence to vet the details of Plymouth Rock Assurance's proposed purchase.

31.     However, by June of 2020, Plymouth Rock Assurance ultimately, and unilaterally, chose not to proceed forward with the purchase of Tri-State.

32.     Yet again, Tri-State and its majority shareholder, WT Holdings, desired to pursue the deal.

33.     Shortly after the Plymouth Rock Assurance purchase negotiations ended, Mr. Slatery informed Ms. Hart that WT Holdings was considering having its subsidiary, Stillwater Property and Casualty Insurance Company ("Stillwater"), acquire TSC Insurance either by stock purchase, merger, or otherwise.

34.     Mr. Slatery expressly told Ms. Hart that to make the merger and/or sale to Stillwater "go more smoothly and more quickly", the sale/merger price would be less than fair market value for TSC Insurance.

35.     Ms. Hart, however, did not wish to see TSC Insurance merge into or otherwise be acquired by Stillwater—particularly not for less than market value—because, among other things, she believed the merger would result in the "consolidation" (i.e., termination) of most, if not all, of the employees of TSC Insurance—many of whom Ms. Hart had worked with for more than a decade.

36.     Accordingly, Ms. Hart informed WT Holdings and Mr. Slatery that she wanted to purchase Tri-State, rather than have Tri-State merge with or be acquired by Stillwater.

37.     After further discussions with Mr. Slatery, Ms. Hart agreed to acquire Tri-State on substantially similar terms to those proposed by Plymouth Rock Assurance.  .

III.     Ms. Hart's efforts to purchase Tri-State

38.     On August 10, 2020, Mr. Slatery's assistant, Emmel Golden, confirmed, via e-mail, the details WT Holdings would be looking for in a letter of intent ("LOI") from Ms. Hart.  His email indicated that the "Purchase price would be 100% of Tangible GAAP Book value at closing plus $14 million" and that "We will grant a period of exclusivity until 9/30/2020 that would restrict us from having talks with other potential buyers, but we would not preclude us from continuing our ongoing work to prepare for Stillwater acquisition of Tri-State."

39.     Two days later, via email on August 12, 2020, Mr. Slatery himself confirmed certain terms, including the price and period of "exclusivity through **at least** September 30th." (Emphasis added).

40.     In reliance upon these promises, Ms. Hart incurred significant time and expense engaging and working with several professionals—including legal counsel, numerous consultants, and investment bankers—to begin lining up the sources of her financing and assembling a package for the proposed purchase that would meet the price and terms of purchase proposed by the Defendants on August 10, 2020.  Ms. Hart also incurred substantial damages to her reputation, as well as lost opportunity costs, as a result of Defendants' false promises and her reliance thereon.

IV.     <u>Tri-State and WT Holdings began fraudulently inducing, and imposing economic duress on, Ms. Hart to sell her minority Tri-State interest/ownership.</u>

41.     Beginning, in and around mid-November 2020, Mr. Slatery told Ms. Hart that before any purported sale to her could occur, and/or before the potential merger with Stillwater could occur, WT Holdings required Ms. Hart to resign her positions as President and CEO of Tri-State, and she also would be required to sell her three percent (3%) stock interest back to WT Holdings.

42.     To that end, on November 17, 2020, at 10:33 a.m., Mr. Slatery sent Ms. Hart an email proposing that WT Holdings would pay her a severance of $1.1 million if she resigned her positions.

43.     The November 17, 2020, e-mail also included a proposal that WT Holdings would compensate Ms. Hart for her three percent (3%) stock interest in Tri-State, such that WT Holdings would pay her $1,410,227.00, based on an unaudited value from October 31, 2020.

44.     However, Mr. Slatery stated that Ms. Hart had to accept those terms by 5:00 p.m. the following day, otherwise the Board of Directors would convene and simply terminate Ms. Hart from her positions and move forward with the merger with Stillwell.

45.     Tellingly though, in the same email, Mr. Slatery also stated: "This deadline is intended to emphasize our strong desire to bring focus to the matters at hand and to bring these matters to a quick resolution. Our expectation is that filings for the merger of Tri-State and Stillwater will be submitted shortly and the merger will become effective 1/1/2021. *We encourage you to continue your efforts to bring an offer to WT Holdings for the purchase of Tri-State until the merger becomes effective*."  (Emphasis added).

46.     What is more, Mr. Slatery concluded that email by stating: "We appreciate all the work you did for us, but the time has come to move on to the next chapter. We value the

relationship with you and would like to exit on good terms. We are asking for your resignation so we all can move forward. If you decline, the likely alternatives will result in you receiving far less monetary value for your shares and no severance payment. *This is not a threat and not a path we want to go down, but us being fully transparent with you*." (Emphasis added).

47.     Mr. Slatery and WT Holdings were being anything but transparent with Ms. Hart.

48.     Mr. Slatery called a meeting of the Board of Directors of Tri-State and of TSC Insurance—without giving the proper or required notice of the meeting—for the purpose of terminating Ms. Hart's employment.

49.     Mr. Slatery told Ms. Hart in no uncertain terms that she could either (1) resign and sell her shares at the value offered and continue moving forward with the purchase of Tri-State, or (2) be terminated without severance, receive less value for her shares, and forgo the purchase of Tri-State.

50.     Ms. Hart attempted to contact the Defendants to determine why they were suddenly demanding her compliance with these new, unilaterally-imposed terms, particularly in light of the ongoing negotiations for her purchase of Tri-State.

51.     Instead of responding to Ms. Hart's inquiries and/or discussing the Defendants' unilaterally-established terms with her, via e-mail at 4:13 p.m. on November 20, 2020, Defendants reiterated their ultimatum to Ms. Hart, but they reduced the previously-offered price by $100,000.00.  What is more, the Defendants demanded that Ms. Hart accept the deal and return the executed paperwork "without changes" by 5:00 p.m. that day, i.e., forty-seven (47) minutes later.

52.     Notwithstanding, yet again, on November 23, 2020, at 7:06 a.m., Ms. Hart wrote to Mr. Slatery seeking clarification on why he and WT Holdings were setting apparently-arbitrary

deadlines and attempting to apparently punish her based on those arbitrary deadlines, despite the fact that Mr. Slatery had previously committed that Ms. Hart: (a) would be "allow[ed] the opportunity to come up with a legitimate buyer by year end"; and (b) "would keep [her] shares and [her] job until the merger happened or until [she] failed to raise money [for her purchase of Tri-State] (whichever came first)."

53.     In reply, Mr. Slatery simply regurgitated Mr. Golden's previous note that "We will strongly consider an offer that meets our parameters Penny can bring before the merger is concluded . . . .  We continue to encourage her effort to bring a solid offer."  He then noted that, "I am available to talk today, of course.  CKS [Charles K. Slatery]."

54.     Following that, Ms. Hart spoke to Mr. Slatery by telephone and in-person about everything that was transpiring.   During those conversations, Mr. Slatery reaffirmed that WT Holdings would entertain an offer if she could propose one before the end of the year.

55.     Nevertheless, he explained that the resignation of her positions and sale of her stock to WT Holdings was a necessary first step in that process—after he previously exerted pressure on Ms. Hart by emphasizing that he "really needed her to cooperate"—explaining that if she did not, she would be terminated by the Board of Directors, which, as he explained, meant (a) she would receive absolutely no severance—as opposed to the $1 million severance the Board was offering at the time, and (b) she would receive far less monetary value for her shares post-termination, rather than through the sale the Board was offering at the time.

56.     Mr. Slatery made clear to Ms. Hart that if she did "cooperate," she would be afforded the opportunity to purchase Tri-State.

57.     Accordingly, on November 30, 2020, confident that she could meet WT Holdings' price for the purchase of Tri-State, and in order to keep the deal moving forward in reliance on

WT Holdings' and Mr. Slatery's representations that her opportunity to purchase Tri-State would continue if she signed WT Holding's agreements, Ms. Hart "cooperated" by executing and returning both of the agreements WT Holdings and Mr. Slatery had prepared.

58.     Thereafter, Ms. Hart continued her tireless efforts to put together a purchase proposal for Tri-State, all the while communicating with Mr. Slatery about the progress and status of the proposal and the efforts being exerted to create the same.

59.     On December 1, 2020, Mr. Slatery still called the meeting of the Board of Directors, at which time he terminated other Board members who, upon information and belief, he believed were sympathetic to Ms. Hart and/or who would oppose his plans to have Stillwater purchase Tri-State for far less than the amount Ms. Hart was prepared to offer, and for far less than fair market value.

60.     Upon information and belief, at the December 1, 2020, Board meeting, and prior to the termination of the Board members who were favorable to Ms. Hart, an inquiry was made as to the potential sale of Tri-State to Ms. Hart; the favorable Board members were then terminated.

61.     On or about December 13, 2020, Ms. Hart sent two letters of intent to Mr. Slatery for her proposed purchase of Tri-State, both of which met the price terms set forth by WT Holdings and Mr. Slatery on August 10, 2020.  However, via several text messages between December 14, 2020, and December 21, 2020, Mr. Slatery claimed he "did not receive" the two letters of intent from Ms. Hart, claiming there may have been an issue with her emails going to his "junk folder."

62.     Upon information and belief, none of Ms. Hart's numerous emails to Mr. Slatery in the previous years had gone to his "junk folder."

63.     Eventually though, by December 21, 2020, Mr. Slatery confirmed he received the letters of intent, and he flatly rejected them as alleged "mere indication of interest, not serious offers."

64.     The letters of intent provided by Ms. Hart indicated that she and her proposed financiers would purchase Tri-State at "[n]et Tangible Book Value as of December 31, 2020 adjusted for the deduction of a pre-close special dividend of its Schedule BA Assets and the addition of $14,000,000." Based on the book value as of November and December 2020, the overall purchase price was, upon information and belief, likely to be more than $80 million dollars.

65.     That price represented a significant increase over the purchase price anticipated by the Plymouth Rock Assurance letter of intent, which provided that "[u]sing 6/30/19 tangible equity of $51 million (inclusive of the Schedule BA assets) as presented by management, this implies a purchase price of $65.0 million at close."

66.     In addition to being approximately $15 million more than the Plymouth Rock offer, upon information and belief, the anticipated purchase price from Ms. Hart and her financiers also represents significantly more than the proposed acquisition by/merger with Stillwater.

67.     Nevertheless, upon information and belief, to date, Mr. Slatery has not presented any of Ms. Hart's offers to purchase Tri-State to the Board of Directors or, more broadly, the shareholders of WT Holdings.

68.     The reason WT Holdings and Mr. Slatery have not made any good faith effort to engage with Ms. Hart about her proposed purchase of Tri-State is because their offer to entertain, and "strongly consider," those offers and negotiate with her was a ruse all along.

69.     Defendants never intended to entertain any potential sale of Tri-State to Ms. Hart. Instead, Defendants intended to move forward with the merger with Stillwater.

70.     Thus, Defendants devised and executed a plan through which they intentionally misrepresented their willingness to entertain and "strongly consider an offer that meets our parameters" for the purpose of inducing her into (a) resigning her positions as President and CEO of Tri-State and (b) selling her three percent (3%) stock ownership interest at significantly less than fair market value.

71.     Specifically, Defendants realized that as President, CEO, and a three percent (3%) shareholder of Tri-State, Ms. Hart was entitled to various rights under New York State Insurance Law, New York State Business Corporation Law, and the Tri-State Shareholders Agreement.

72.     If WT Holdings sought to merge, or otherwise sell, all or substantially all of Tri-State's then-current holdings over Ms. Hart's objection(s), she would be entitled to exercise some or all of those rights.

73.     Upon information and belief, those rights included, but were not limited to: (a) a right of first refusal; (b) a right to remain a member of the board of directors during the entire duration of her employment; and (c) a right to an independent, fair-market valuation of Tri-State, together with a compulsory buyout of her ownership interest at fair market value price.

74.     Defendants did not want Ms. Hart to exercise her substantive rights while they examined selling all, or substantially all, of Tri-State's assets and holdings.

75.     Defendants did not want Ms. Hart maintaining her status as a member of the Board of Directors and questioning why Mr. Slatery was not bringing to their attention numerous bona fide offers for the purchase of Tri-State at substantially better value than the proposed acquisition and/or merger by Stillwater.

76.     Defendants did not want to have to appraise or otherwise pay Ms. Hart a fair valuation of her three percent (3%) interest in Tri-State. Indeed, an appraisal of Tri-State and the

value of its shares would bring to light the vast disparity of the value for which Mr. Slatery was trying to have Stillwater acquire and/or merge with Tri-State.

77.    Ultimately, Mr. Slatery/Defendants' plan worked, and they were able to fraudulently induce Ms. Hart into (a) resigning her positions with Tri-State and (b) selling her three percent (3%) interest in the company at significantly less than fair market value; thus allowing Defendants to buy Ms. Hart's Tri-State shares for a depressed price without appraisal and to move forward with the plans to merge Tri-State with Stillwater without any delay or obstruction from Tri-State's minority shareholder—Ms. Hart.

78.    Indeed, if Tri-State terminated Ms. Hart rather than inducing her to resign, Ms. Hart would have had the right to an independent appraisal, a time consuming endeavor, and purchase of her three percent (3%) interest at fair market value based on the appraisal.

79.    Similarly, if WT Holdings attempted to merge Stillwater and Tri-State while Ms. Hart was still a three percent (3%) owner of Tri-State, rather than improperly inducing Ms. Hart to first sell her interest, Ms. Hart would have had the right to dissent and force an independent appraisal and purchase of her shares for fair market value.

80.    In order to circumvent Ms. Hart's legal rights as a minority shareholder and/or terminated employee, WT Holdings and Mr. Slatery used misrepresentations about her purchase of Tri-State, and threats about what would happen if she did not cooperate, to induce Ms. Hart to execute agreements resigning her employment and selling her shares at below-market value without the opportunity for an independent appraisal.

81.    In fact, rather tellingly, Mr. Slatery and the Defendants have never made any good-faith effort to respond to Ms. Hart's letters of intent for the purchase of Tri-State.  That is because,

despite their numerous representations for months, WT Holdings and Mr. Slatery never had any intention to sell Tri-State to Ms. Hart or even entertain her good faith offer.

82.     Instead, after achieving the goal of depriving Ms. Hart of her substantive rights, Mr. Slatery, on behalf of Defendants, simply dismissed Ms. Hart's purchase offer without, upon information and belief, ever presenting it to the Board of Directors of Tri-State and/or WT Holdings, and without substantively responding to the proposed terms.

V.     Mr. Slatery's hidden, ulterior motive to have fraudulently induced, and exerted economic duress on, Ms. Hart to resign from her positions with Tri-State and accept less-than fair market value for her minority interest.

    a.     *Mr. Slatery's hidden, ulterior motive in connection with Tri-State and Stillwater.*

83.     Mr. Slatery, at all relevant times, had control and/or dominion over Defendants Tri-State and WT Holdings and was acting, both actually and apparently, in his roles therewith.

84.     In addition to the Defendants' overall plan to circumvent Ms. Hart's imminent objection to a proposed merger and/or sale of all or substantially all of Tri-State's holdings, Mr. Slatery had other, personal motivations to ensure that Ms. Hart did not succeed in purchasing Tri-State.

85.     Specifically, Mr. Slatery is an owner and officer of an entity named NFC Investments, LLC ("NFC Investments"), which, upon information and belief, is a limited liability company organized and existing under the laws of the State of Tennessee, with its principal place of business located at 510 South Mendenhall Road, Suite 200, Memphis, Tennessee 38117—i.e., the same office as WT Holdings.

86.     NFC Investments is the entity that manages various investment portfolios for insurance companies, including TSC Insurance and, upon information and belief, Stillwater.

87.     Upon information and belief, the Tri-State and Stillwater investment portfolios alone total several hundred million dollars of investments.

88.     As an owner and officer of NFC Investments, Mr. Slatery has a personal financial interest in ensuring that those investment portfolios continue to be managed by NFC Investments, so that the company and Mr. Slatery can continue to reap the benefit of the commissions earned from those investment portfolios.

89.     If Ms. Hart purchased Tri-State, she would no longer be obligated to have the investment portfolios for TSC Insurance be managed by NFC Investments to Mr. Slatery's own personal detriment.

90.     Thus, if Ms. Hart purchased Tri-State, Mr. Slatery would lose control of that company and its approximately $110 million dollar investment portfolio(s), and the personal financial gain he received from retaining his own investment firm, NFC Investments, to manage Tri-State's investments.

91.     Upon information and belief, NFC Investment, at all times relevant hereto, also managed the investment portfolio for Stillwater—an entity also wholly owned by WT Holdings.

92.     Therefore, upon information and belief, after learning that Ms. Hart desired to purchase Tri-State on more beneficial terms than the potential merger of Tri-State and Stillwater, Mr. Slatery developed and prosecuted the plan to deprive Ms. Hart of her substantive rights not only to dissent to a merger, require an appraisal, and sell her shares for fair market value, but also to ensure that he would personally continue to profit from the investment portfolios being managed by NFC Investments.

      b.     *Mr. Slatery's hidden, ulterior motive in connection with Tri-State and Gramercy Indemnity Company.*

93.     Tri-State re-insured various claims primarily underwritten by Gramercy Indemnity Company ("Gramercy"), and held approximately 20% of the exposure for those claims as a result thereof.

94.     Upon information and belief, WT Holdings is an owner of Gramercy.

95.     Upon information and belief, Mr. Slatery is an owner and/or officer of Gramercy.

96.     Upon information and belief, Mr. Slatery and NFC Investments were responsible for the investment portfolio(s) of Gramercy.

97.     In or around the time the Plymouth Rock Assurance's purchase offer was being considered by Tri-State, Ms. Hart began reviewing certain Gramercy claims that were re-insured by Tri-State.

98.     Ms. Hart determined that several of those claims appeared to be under-reserved.

99.     Ms. Hart brought her concerns about the Gramercy claims to Mr. Slatery, and recommended that Tri-State perform a full claims audit on them.

100.     On or around March 25, 2020, Mr. Slatery told Ms. Hart that she was not to audit or otherwise review the Gramercy claims that were re-insured by Tri-State.

101.     Mr. Slatery further instructed Ms. Hart that under no circumstances was she to bring her "unfounded concerns" about the Gramercy claims to the attention of the Tri-State Board of Directors.

102.     Upon information and belief, Mr. Slatery did not wish to have a full claims audit conducted on the Gramercy claims because, if the reserves for the Gramercy claims had to be increased, it would bring attention to the fact that Gramercy was not as lucrative as Mr. Slatery held it out to be to the Tri-State Board of Directors and WT Holdings shareholders.

103.     Upon information and belief, by June 2020 when the Plymouth Rock Assurance purchase offer had been withdrawn, Mr. Slatery knew that if Ms. Hart either (a) successfully purchased Tri-State or (b) remained the President, CEO, and a Board member of Tri-State at the time of the potential Stillwater-Tri-State merger/acquisition, Ms. Hart's concerns about Gramercy's claims would be brought to the attention of Tri-State's Board of Directors and/or the shareholders of WT Holdings.

104.     Therefore, upon information and belief, in addition to all of the other motivations and bases for seeking Ms. Hart's divestiture as an officer and shareholder of Tri-State, Mr. Slatery also sought her divestiture to ensure that his malfeasance and disregard of the Gramercy issues would not come to light.

105.     As a result of all of the Defendants' fraudulent conduct, Plaintiff has been deprived of her substantive rights as a shareholder of Tri-State.  Consequently, Ms. Hart has been damaged by the Defendants' conduct in an amount to be proven at trial based on an independent, fair-market valuation of Tri-State as of November 30, 2020, which upon information and belief, will show that Plaintiff has suffered damages of not less than $1,750,000.00.

<u>FIRST CAUSE OF ACTION</u>

(Section 10(b) of the Securities and Exchange Act of 1934 ("Exchange Act") and Rule 10b-5)

106.     Plaintiff repeats and realleges the foregoing paragraphs as if set forth herein in full.

107.     Defendants, directly or indirectly, by the use of means or instrumentality of interstate commerce or of the mails, used or employed, in connection with the purchase or sale of securities, manipulative or deceptive devices or contrivances in contravention of the rules and regulations prescribed by the SEC, including Rule 10b-5 (17 C.F.R. § 240.10b-5).

108. Defendants, directly or indirectly, in connection with the purchase or sale of securities, used or employed a device, scheme, or artifice to defraud.

109. Defendants, directly or indirectly, in connection with the purchase or sale of securities, made untrue statements of material fact and omitted to state material facts necessary in order to make statements made, in the light of the circumstances under which they were made, not misleading.

110. Defendants, directly or indirectly, in connection with the purchase or sale of securities, engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Plaintiff in connection with the purchase or sale of securities.

111. In particular with regard to Mr. Slatery, as previously described, Mr. Slatery, on behalf of himself and as an agent of Tri-State and WT Holdings, made material misrepresentations, material misstatements, and omitted material facts related to the sale of securities in order induce Plaintiff Ms. Hart into (a) resigning her positions with Tri-State and (b) selling her three percent (3%) interest in the company at significantly less than fair market value, which included the following false material representations:

    a. Telling Ms. Hart that Defendants would seriously consider any purchase offer Ms. Hart could put forward if it met certain key terms and expectations, which were set forth via email on August 10, 2020, including that the "Purchase price would be 100% of Tangible GAAP Book value at closing plus $14 million.";

    b. Shortly thereafter, telling Ms. Hart that she (a) would be "allow[ed] the opportunity to come up with a legitimate buyer by year end"; and (b) "would keep [her] shares and [her] job until the merger happened or until [she] failed to raise money [for her purchase of Tri-State] (whichever came first).";

c. Reiterating to Ms. Hart on or about November 17, 2020, that before any purported sale to her could occur, and/or before the potential merger with Stillwater could occur, WT Holdings required Ms. Hart to resign her positions as President and CEO of Tri-State, and she also would be required to sell her three percent (3%) stock interest back to WT Holdings;

d. Telling Ms. Hart via email on November 17, 2020, at 10:33 a.m., that WT Holdings would compensate Ms. Hart for her three percent (3%) stock interest in Tri-State, such that WT Holdings would pay her $1,410,227.00, based on an unaudited value from October 31, 2020, and stating that "If you decline, the likely alternatives will result in you receiving far less monetary value for your shares and no severance payment. This is not a threat and not a path we want to go down, but us being fully transparent with you.";

e. Shortly thereafter, explaining to Ms. Hart that if she did not "cooperate" by executing the agreements Defendants had prepared, she would be terminated by the Board of Directors of Tri-State; and

f. Telling Ms. Hart that if she did "cooperate" and sign the agreements Defendants had prepared, she would be afforded the opportunity to purchase Tri-State.

112. As previously described, Defendants' material representations were false, and Defendants' concealed and omitted material facts, because:

a. In reality, Defendants had no intention of considering Plaintiff's purchase of Tri-State, even if Plaintiff met Defendants' proposed terms, but rather concealed their true intentions and misrepresented to Plaintiff that she would have the opportunity to purchase Tri-State if she resigned her officer and

director positions, and sold back her shares, in order to remove impediments and obstructions to their plans—which Plaintiff could raise pursuant to her legal and contractual rights as an officer, director, and owner—to merge Tri-State and Stillwater;

b.  Defendants intended to move forward with a merger without regard to Plaintiff's proposed offer; and

c.  Defendants sought to circumvent Ms. Hart's substantive rights as dissenting officer and three-percent (3%) shareholder of Tri-State, because they knew that if they chose to move forward with the Stillwater transaction and sought to terminate Ms. Hart, she would be entitled to an independent fair-market valuation of the company, and she would be entitled to receive fair market value for her ownership interest, which, upon information and belief, Defendants knew would be substantially higher than the price they were offering her for her ownership interest.

113.  In addition, although Mr. Slatery was advised and knew that Plaintiff was seeking to purchase Tri-State and would otherwise exercise, and/or be entitled to exercise, her substantive rights as a director, officer, and minority shareholder in Tri-State if she was unable or unwilling to purchase Tri-State, Mr. Slatery knowingly misrepresented to Ms. Hart that if she "cooperated" with the Defendants by signing the agreements they prepared for her to resign her positions and sell her shares, that she would be afforded a full and fair opportunity to purchase Tri-State on the terms that had previously been conveyed to her by Defendants—despite the fact that Mr. Slatery knew that was not true.

114.    As previously discussed, Mr. Slatery, on behalf of himself and Tri-State and WT Holdings, made the aforementioned material misrepresentations during numerous telephone calls and email communications between June 2020 and December 2020.

115.    As previously discussed, Ms. Hart knew and understood that Mr. Slatery was representing and acting on behalf of Tri-State and its majority shareholder, WT Holdings, in all meetings, teleconferences, and email communications regarding the potential sale of Tri-State to Ms. Hart and/or its sale to, or merger with, Stillwater, and any information, representations, or materials provided by Mr. Slatery and Tri-State were shared with Ms. Hart, and were intended to be provided to Ms. Hart.

116.    In addition, upon information and belief, Defendants' material misrepresentations and omissions included their failure to disclose the true payment(s) and benefit(s) they were receiving and would continue to receive in exchange for advising, recommending, and steering Plaintiff to divest herself of her positions and ownership interest in Tri-State in exchange for the opportunity to purchase Tri-State.

117.    The previously described misrepresentations and omissions made by Mr. Slatery, on behalf of himself, Tri-State, and WT Holdings,  were material because a reasonable investor would consider such information and omissions important in determining whether to divest themselves of their positions with, and ownership interests in, Tri-State, and Plaintiff in fact relied up on such misrepresentations and omissions in agreeing to divest herself of her positions and ownership interest in Tri-State in exchange for the opportunity to purchase Tri-State.

118.    As previously discussed, Mr. Slatery, on behalf of himself, Tri-State, and WT Holdings,  knowingly made the aforementioned materially false statements and omissions with the intent to defraud Plaintiff.

119.    When Mr. Slatery made the above-described materially false misrepresentation and omissions, he either knew their falsity or had a complete and utter reckless disregard for their truth.

120.    Mr. Slatery's misrepresentation and omissions were knowingly and intentionally false, because Defendants never intended to consider any offer to purchase Tri-State from Plaintiff, regardless of how lucrative and/or beneficial any such offer may have been as compared to the contemplated sale to, or merger with, Stillwater.

121.    Mr. Slatery had the motive and opportunity to make misleading statements to defraud Plaintiff because his compensation, directly or indirectly through WT Holdings and NFC Investment, was contingent on or otherwise linked to the amount of money that remained in NFC's Investment's portfolio(s) for Defendants and Stillwater, and Mr. Slatery knew that if Ms. Hart (a) purchased Tri-State, she would no longer be obligated to have the investment portfolio(s) for TSC Insurance and/or Tri-State be managed by NFC Investments, to Mr. Slatery's own personal detriment, and (b) conducted a claims audit of Gramercy it would bring Mr. Slatery's malfeasance and misrepresentations with respect Gramercy to the attention of the Board of Directors and/or shareholders of WT Holdings, and/or it would cause a drastic decrease in the investment portfolios for TSC Insurance, Tri-State, and/or Gramercy managed by NFC Investments, to Mr. Slatery's own personal detriment.

122.    Plaintiff justifiably relied on Mr. Slatery's aforementioned misrepresentations, omissions of material fact, advice, and recommendations, made on behalf of himself, Tri-State, and WT Holdings, in agreeing to divest herself of her positions and ownership interest in Tri-State in exchange for the opportunity to purchase Tri-State, and Plaintiff would not have so divested herself had she known the truth.

123.    By reason of the foregoing, Defendants committed unlawful fraudulent conduct in connection with the purchase or sale of securities in violation of Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b-5 (17 C.F.R. § 240.10b-5).

124.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and will continue to suffer, substantial monetary damages.

125.    By reason therefor, Plaintiff seek a judgment against Defendants, jointly and severally, for all damages caused by their violations of Section 10(b) of the Exchange Act and Rule 10b-5 in an amount to be proven at trial, but not less than $1,750,000, plus interest and costs.

## SECOND CAUSE OF ACTION

(Sections 20(a) of the Exchange Act against Defendant Slatery)

126.    Plaintiff repeats and realleges the foregoing paragraphs as if set forth herein in full.

127.    At all times mentioned, Mr. Slatery controlled Tri-State and WT Holdings by virtue of his key, high-level positions at/with Tri-State and its majority shareholder, WT Holdings.

128.    In particular, Mr. Slatery was at the relevant times CEO and Chairman of the Board of Directors of WT Holdings—the controlling shareholder of Tri-State—and upon information and belief, the Chairman of the Board and Executive Vice President of Tri-State.

129.    By reason of his positions at Tri-State and WT Holdings, Mr. Slatery had authority over Tri-State's and WT Holdings' operations, participated in the day-to-day management of Tri-State and WT Holdings, and was the ultimate decision maker for Tri-State and WT Holdings.

130.    As such, Mr. Slatery was a "controlling person" for the acts of Tri-State and WT Holdings—the controlled persons—pursuant to Section 20(a) of the Securities and Exchange Act.

131.    As previously discussed in detail, including the allegations previously set out detailing each Defendants' conduct in violation of Section 10(b) of the Exchange Act and Rule 10b-5, Tri-State, WT Holdings, and Mr. Slatery are primary violators of the Exchange Act based on their fraudulent conduct in connection with Plaintiff's divestiture of her positions and sale of her ownership interest in Tri-State to WT Holdings in exchange for the right to purchase Tri-State.

132.    As previously discussed in detail, including the allegations previously set out detailing each Defendants' conduct in violation of Section 10(b) of the Exchange Act and Rule 10b-5, Mr. Slatery was a culpable participant in the fraudulent conduct in connection with Plaintiff's divestiture of her positions and sale of her ownership interest in Tri-State in exchange for the right to purchase Tri-State.

133.    In particular, as previously discussed, Mr. Slatery made misrepresentations and material omissions in furtherance of the fraud related to Plaintiff's divestiture of her positions and sale ownership interest in Tri-State in exchange for the opportunity to purchase Tri-State.

134.    Mr. Slatery's conduct in furtherance of the fraud, induced the aforementioned violations of the Exchange Act.

135.    By reason of the foregoing, Mr. Slatery violated Section 20(a) of the Exchange Act (15 U.SC. § 78t).

136.    By reason of the foregoing, Mr. Slatery is individually liable to the same extent as Tri-State and WT Holdings for violations of the Exchange Act.

137.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and will continue to suffer, substantial monetary damages.

138.    By reason therefor, Plaintiff seeks a judgment against Defendants, jointly and severally, in an amount to be proven at trial, but not less than $1,750,000, plus interest and costs.

## THIRD CAUSE OF ACTION

(Fraudulent Inducement)

139.   Plaintiff repeats and re-alleges the preceding paragraphs as if fully set forth and incorporated herein.

140.   The Defendants made known material misrepresentations and omissions of material fact to induce Plaintiff to execute agreements resigning her employment, to sell her ownership interests, and to surrender her contractual and statutory rights arising therefrom.

141.   In particular, as previously described, Defendants' material misrepresentations, material misstatements, and omitted material facts made in order to induce Plaintiff's resignation and sale of her shares, included:

    a.    Telling Ms. Hart that Defendants would seriously consider any purchase offer Ms. Hart could put forward if it met certain key terms and expectations, which were set forth via email on August 10, 2020, including that the "Purchase price would be 100% of Tangible GAAP Book value at closing plus $14 million.";

    b.    Shortly thereafter, telling Ms. Hart that she (a) would be "allow[ed] the opportunity to come up with a legitimate buyer by year end"; and (b) "would keep [her] shares and [her] job until the merger happened or until [she] failed to raise money [for her purchase of Tri-State] (whichever came first).";

    c.    Reiterating to Ms. Hart on or about November 17, 2020, that before any purported sale to her could occur, and/or before the potential merger with Stillwater could occur, WT Holdings required Ms. Hart to resign her

positions as President and CEO of Tri-State, and she also would be required to sell her three percent (3%) stock interest back to WT Holdings;

d.  Telling Ms. Hart via email on November 17, 2020, at 10:33 a.m., that WT Holdings would compensate Ms. Hart for her three percent (3%) stock interest in Tri-State, such that WT Holdings would pay her $1,410,227.00, based on an unaudited value from October 31, 2020, and stating that "If you decline, the likely alternatives will result in you receiving far less monetary value for your shares and no severance payment. This is not a threat and not a path we want to go down, but us being fully transparent with you.";

e.  Shortly thereafter, explaining to Ms. Hart that if she did not "cooperate" by executing the agreements Defendants had prepared, she would be terminated by the Board of Directors of Tri-State; and

f.  Telling Ms. Hart Mr. Slatery that if Ms. Hart did "cooperate" and signed the agreements Defendants had prepared, she would be afforded the opportunity to purchase Tri-State.

142.  As previously described, Defendants' representations were false, and Defendants' concealed and omitted material facts, because:

a.  In reality, Defendants had no intention of seriously considering Plaintiff's purchase of Tri-State, even if Plaintiff met Defendants' proposed terms;

b.  Defendants intended to move forward with a merger without regard to Plaintiff's proposed offer; and

c.  Defendants sought to circumvent Ms. Hart's substantive rights as dissenting officer and three-percent (3%) shareholder of Tri-State, because they knew

that if they chose to move forward with the Stillwater transaction and sought to terminate Ms. Hart, she would be entitled to an independent fair-market valuation of the company, and she would be entitled to receive fair market value for her ownership interest, which, upon information and belief, Defendants knew would be substantially higher than the price they were offering her for her ownership interest.

143.   Defendants' representations were material because Plaintiff reasonably considered such misrepresentations and omissions, and relied on such misrepresentations and omissions, in determining whether to resign her employment, sell her shares, and give up her various legal and contractual rights arising from her employment and ownership.

144.   Defendants knowingly made the aforementioned materially false statements and omissions with the intent to defraud Plaintiff, and to induce Plaintiff to execute agreements resigning her employment, ownership interests, and related rights.

145.   Defendants' fraudulent conduct was for its own benefit because, once Plaintiff executed the agreements, Defendants would:

   a.   Terminate Plaintiff's right to a fair-market valuation and fair value for her shares;

   b.   Eliminate Plaintiff's right to a seat on Tri-State's Board of Directors;

   c.   Terminate Plaintiff's right to object to the merger as a shareholder, officer, and director; and

   d.   Avoid the various delays and impediments to Defendants' merger plans that would arise from Plaintiff's assertion of her aforementioned rights.

146.    Plaintiff reasonably and justifiably relied on the material misrepresentations and omissions because Plaintiff had a longstanding, trusting relationship with Mr. Slatery, and based on Defendants' purported superior knowledge of WT Holdings desire to sell Plaintiff Tri-State Insurance, and its requirement she first resign her position and sell back her 3% interest.

147.    In reliance on Defendants' material misrepresentations and omissions of material fact, Plaintiff in fact signed the agreements resigning her employment and selling her shares for less than fair market value without an appraisal.

148.    Plaintiff would not have signed the agreements resigning her position and selling her shares had she known the truth.

149.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and will continue to suffer, substantial monetary damages.

150.    By reason therefor, Plaintiff seeks a judgment against Defendants, jointly and severally, for all damages sustained as a result of the Defendants' conduct, in an amount to be proven at trial based on (a) an independent, fair-market valuation of Tri-State as of November 30, 2020, and (b) the significant expenses Ms. Hart incurred to assemble her proposals for the purchase of Tri-State, all in an amount not less than $1,750,000.00.

FOURTH CAUSE OF ACTION

(Economic Duress)

151.    Plaintiff repeats and re-alleges the preceding paragraphs as if fully set forth and incorporated herein.

152.    As previously described, Defendants threatened Ms. Hart with an ultimatum that she must resign her positions as President and CEO of Tri-State, or she would be terminated from

her positions, which Defendants explained "will result in you receiving far less monetary value for your shares and no severance payment."

153.    Defendants made those threats for the purpose of pressuring Ms. Hart into (a) relying on those statements by actually resigning her positions and selling her shares, and (b) forbearing from inquiring into the Defendants' true motives and plans for the company.

154.    Indeed, when Ms. Hart did not immediately accept the Defendants' ultimatum, they further exerted pressure upon her by reducing their monetary offer to her by $100,000.00, and demanding that she accept the offer "without changes," within forty-seven (47) minutes of the Defendants re-asserting the newly-lowered ultimatum.

155.    Moreover, Defendants made it clear to Ms. Hart in no uncertain terms that she could either (1) resign and sell her shares at the value offered and continue moving forward with the purchase of Tri-State, or (2) be terminated without severance, receive less value for her shares, and forgo the purchase of Tri-State.

156.    Compelled by the Defendants' demands, and in reasonable reliance on the Defendants' representations, on November 30, 2020, Ms. Hart "cooperated" by executing and returning both of the agreements Defendants had prepared.

157.    Ms. Hart was compelled to accept the Defendants' terms based on the Defendants' wrongful threats, coupled with the unreasonably short and arbitrary deadlines they set for her.

158.    The Defendants' wrongful conduct effectively precluded Ms. Hart from exercising free will in connection with the agreements the Defendants had prepared.

159.    But for the Defendants' wrongful threats and duress, Ms. Hart would have had the right to an independent appraisal of Tri-State, and she could have compelled Tri-State to purchase her three percent (3%) interest at fair market value based on that appraisal.

160.    Therefore, Ms. Hart has been damaged by the Defendants' conduct in an amount to be proven at trial based on an independent, fair-market valuation of Tri-State as of November 30, 2020, which upon information and belief, will show that Plaintiff has suffered damages of not less than $1,750,000.00.

FIFTH CAUSE OF ACTION

(Breach of Contract)

161.    Plaintiff repeats and re-alleges the preceding paragraphs as if fully set forth and incorporated herein.

162.    As of August 31, 2010, Plaintiff, WT Holdings, and Tri-State entered into the Shareholder Agreement of The Tri-State Consumer, Inc. (the "Shareholder Agreement").

163.    In accordance with the terms and conditions of the Shareholder Agreement, Plaintiff was entitled to certain rights and remedies in the event that Tri-State terminated her employment as an officer of the company.

164.    Also in accordance with the terms and conditions of the Shareholder Agreement, Plaintiff was entitled to certain rights and remedies in the event that Tri-State sought to sell or otherwise transfer all or substantially all of its assets.

165.    In either event, one of the rights and remedies available to Plaintiff was the right to have an independent appraisal of Tri-State conducted, for the purpose of establishing the fair market value of each share of the company.  Additionally, once the fair market value of the shares was established, Plaintiff had the right to require the company to purchase her three percent (3%) interest at fair market value.

166.    Implied in every contract in the State of New York is a covenant of good faith and fair dealing.

167.     Among other things, the covenant of good faith and fair dealing requires contracting parties to refrain from engaging in ay conduct that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract at issue.

168.     Defendants breached the Shareholder Agreement and its implied covenant of good faith and fair dealing by engaging in a course of conduct that was designed to induce Plaintiff into resigning her positions with the company and selling her three percent (3%) interest in the company for far less than fair market value, all for the purpose of preventing Plaintiff from exercising her substantive rights under the Shareholder Agreement, which, among other things, included the right to have an independent appraisal conducted on the company, and the right to require the company to purchase her three percent (3%) interest at fair market value.

169.     As a result of the Defendants' breach of the Shareholder Agreement and its implied covenant of good faith and fair dealing, Ms. Hart has been damaged in an amount to be proven at trial based on an independent, fair-market valuation of Tri-State as of November 30, 2020, which upon information and belief, will show that Plaintiff has suffered damages of not less than $1,750,000.00.

<u>DEMAND FOR JURY TRIAL</u>

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby demands a trial by a Jury on all issues triable by right of Jury.

<u>CONCLUSION</u>

WHEREFORE, Plaintiff demands judgment against Defendants:

1.    On the First Cause of Action, an award of damages to Plaintiff in an amount to be proven at trial, but not less than $1,750,000, plus interest.

2.    On the Second Cause of Action, an award of damages to Plaintiff in an amount to be proven at trial, but not less than $1,750,000, plus interest.

3.    On the Third Cause of Action, an award of damages to Plaintiff in an amount to be proven at trial, but not less than $1,750,000, plus interest.

4.    On the Fourth Cause of Action, an award of damages to Plaintiff in an amount to be proven at trial, but not less than $1,750,000, plus interest

5.    On the Fifth Cause of Action, an award of damages to Plaintiff in an amount to be proven at trial, but not less than $1,750,000, plus interest

6.    An award of attorney's fees, costs, and disbursements, together with such other and further relief as the court finds just and proper.

DATED:    February 26, 2021
          Buffalo, New York

DUKE HOLZMAN PHOTIADIS & GRESENS LLP

By:    s/ *Steven W. Klutkowski*
       _____
       Christopher M. Berloth
       Steven W. Klutkowski
       Thomas D. Lyons
       *Attorneys for Plaintiff*
       701 Seneca Street, Suite 750
       Buffalo, New York 14210
       (716) 855-1111
       cberloth@dhpglaw.com
       sklutkowski@dhpglaw.com
       tlyons@dhpglaw.com