USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__11/6/2021____

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X
PENNY HART,                                       :
                                    Plaintiff,    :        21-CV-1738 (VEC)
                                                  :
                -against-                         :
                                                  :        OPINION AND ORDER
THE TRI-STATE CONSUMER, INC., WT                  :
HOLDINGS, INC., AND CHARLES SLATERY,              :
                                                  :
                                    Defendants.   :
-------------------------------------------------------------X

VALERIE CAPRONI, United States District Judge:

Plaintiff Penny Hart has sued Tri-State Consumer, Inc., WT Holdings, Inc., and Charles

Slatery for: (1) violating Sections 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5

promulgated thereunder; (2) violating Section 20(a) of the Securities Exchange Act; (3) fraudulent

inducement; (4) economic duress; and (5) breach of contract. *See* Am. Compl., Dkt. 25. Defendants

have moved to dismiss Plaintiff's amended complaint for lack of personal jurisdiction over

Defendants WT Holding and Slatery pursuant to Rule 12(b)(2) and for failure to state a claim

against any Defendant pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See*

Dkt. 29. Plaintiff opposes the motion. *See* Dkt. 33. For the reasons discussed below,

Defendants' motion to dismiss is GRANTED in part and DENIED in part.

## BACKGROUND

In 2008, Plaintiff and her brother sold 100% of the outstanding stock of Tri-State, a New

York-based insurance company, to Defendant WT Holdings, a Tennessee-based insurance

company. Am. Compl. ¶¶ 5, 38. WT Holdings kept Plaintiff as the President and CEO of Tri-

State, *id.* ¶ 39, and two years later, in or around August 2010, Plaintiff re-purchased three percent

of the outstanding stock of Tri-State from WT Holdings, *id.* ¶ 40.

Between 2018 and 2020, various parties offered to purchase Tri-State, but none of the offers resulted in a deal. *Id.* ¶¶ 44–50.  After negotiations with those potential buyers ended, Defendant Slatery — the President, CEO, and Chairman of the Board of Directors of WT Holdings and the Executive Vice President and Chairman of the Board for Tri-State, *id.* ¶¶ 6, 10, 42 — told Plaintiff that WT Holdings was considering having one of its subsidiaries, Stillwater Property and Casualty Insurance Company ("Stillwater"), acquire Tri-State, "either by stock purchase, merger, or otherwise," *id.* ¶ 51.  Slatery further stated that, to make the merger or sale "go more smoothly and more quickly," the merger/sale price for Tri-State would be less than fair market value. *Id.* ¶ 52.  Plaintiff, who did not want Tri-State to be merged into or otherwise be acquired by Stillwater, *id.* ¶ 53, informed WT Holdings and Slatery that she wanted to purchase Tri-State, *id.* ¶ 54.  On August 10, 2020, Slatery's assistant, Emmel Golden, provided Plaintiff the details of the terms that WT Holdings would be looking for in a letter of intent from Plaintiff. *Id.* ¶ 56.  Two days later, Slatery himself confirmed certain key terms, including the price WT Holdings wanted to achieve. *Id.* ¶ 57.

Beginning in and around November 2020, Slatery started to pressure Plaintiff to resign her positions as President and CEO of Tri-State and to sell her three percent interest in Tri-State to WT Holdings. *Id.* ¶ 59.  Slatery offered Plaintiff a $1.1 million severance payment if she resigned her positions, and offered to pay $1,410,227 for her Tri-State shares. *Id.* ¶¶ 60–61.  Slatery indicated that the sale of shares and her resignation had to occur prior to any sale of Tri-State to her. *Id.* ¶¶ 59, 73–74.

Plaintiff did not accept Slatery's offer; a few days later Defendants reduced the offer by $100,000 and gave Plaintiff exactly forty-seven minutes to accept the deal "without changes." *Id.* ¶ 69.  In response to push back from Plaintiff, Slatery stated, "We will strongly consider an

offer that meets our parameters Penny can bring before the merger [with Stillwater] is concluded. . . . We continue to encourage her effort to bring a solid offer."[1]  *Id.* ¶ 71.  Slatery subsequently reaffirmed to Plaintiff "that WT Holdings would entertain an offer if [Plaintiff] could propose one before the end of the year" but again reiterated that Plaintiff must resign her positions and sell her stock in Tri-State to WT Holdings as a necessary first step in the process.  *Id.* ¶¶ 72–73.  "Mr. Slatery made clear to Ms. Hart that if she did 'cooperate' she would be afforded the opportunity to purchase Tri-State."  *Id.* ¶ 74.  On November 30, 2020, Plaintiff executed and returned to Defendants a Severance Agreement and a Stock Transfer Agreement, pursuant to which she resigned her positions as President and CEO of Tri-State and sold her shares of Tri-State to WT Holdings.[2]  *Id.* ¶ 75.

On or about December 13, 2020, Plaintiff sent two letters of intent to Slatery for her proposed purchase of Tri-State, both of which purportedly met the price terms set by Defendants on August 10, 2020.  *Id.* ¶¶ 79, 82.  Plaintiff's proposed overall purchase price — which was "likely to be more than $80 million dollars" — exceeded past offers and was "significantly more than the proposed acquisition by/merger with Stillwater."  *Id.* ¶¶ 82, 84.  By December 21, 2020, Slatery had confirmed receipt of Plaintiffs' letters of intent but had rejected them as a "mere indication of interest, not serious offers."  *Id.* ¶ 81.  Plaintiff asserts, on information and belief, that Slatery did not present Plaintiff's offers to purchase Tri-State to Tri-State's Board of

---

[1]  For purposes of the motion to dismiss, the Court must accept Plaintiff's well-pled factual allegation as quoted in the text but notes that Defendants assert that the ellipsis in the quoted portion of Slatery's statement obscures the true meaning. According to Defendants, Def. Mem. of Law, Dkt. 32 at 9, n.6, the full email undercuts Plaintiff's narrative that Defendants consistently represented that, if she sold her shares (and resigned), they would give her offer to purchase Tri-State good faith consideration. According to Defendants, by November — whatever communication had occurred in August — Defendants' position was that they were unlikely to accept an offer from Plaintiff unless it was "very attractive." *Id.*

[2]  Inexplicably, the Stock Transfer Agreement is dated November 1, 2020, and the paragraphs are numbered 1, 2, 3 and 7. *See* Decl. of Charles Slatery, Dkt. 30 at Ex. B.

Directors or to the shareholders of WT Holdings, or otherwise respond meaningfully to them.[3]
*Id.* ¶¶ 85, 100.

Plaintiff alleges that, despite Defendants' statements that they would consider Plaintiff's offer if she resigned and sold her shares, "Defendants never intended to entertain any potential sale of Tri-State to Ms. Hart." *Id.* ¶¶ 86–87. Instead, Plaintiff alleges, Defendants misrepresented their intention to consider her offer to purchase Tri-State in order to induce her to resign and sell her shares and thereby give up the rights she would otherwise have had as an officer and shareholder of Tri-State. *Id.* ¶¶ 88–97. Plaintiff further alleges that, "[i]n addition to the Defendants' overall plan to circumvent Ms. Hart's imminent objection to a proposed merger and/or sale of all or substantially all of Tri-State's holdings, Mr. Slatery had other, personal motivations to ensure that Ms. Hart did not succeed in purchasing Tri-State." *Id.* ¶ 102; *see also id.* ¶¶ 103–22 (arguing that Slatery wanted "to deprive Ms. Hart of her substantive rights not only to dissent to a merger, require an appraisal, and sell her shares for fair market value, but also to ensure that he would personally continue to profit from the investment portfolios being managed by [another of Slatery's companies]" and "to ensure that his malfeasance . . . would not come to light").

## DISCUSSION

### I.   Defendants' Motion to Dismiss for Lack of Personal Jurisdiction

Defendants WT Holding and Slatery move to dismiss for lack of personal jurisdiction. To survive a motion to dismiss, "the plaintiff bears the burden of establishing personal jurisdiction over the defendant." *MacDermid, Inc. v. Deiter*, 702 F.3d 725, 727 (2d Cir. 2012)

---

[3]      It is not at all clear whether Plaintiff actually made an offer to purchase Tri-State, as the amended complaint alleges only that letters of intent were sent to Slatery, *see* Am. Compl., Dkt. 25 ¶ 79 ("On or about December 13, 2020, Ms. Hart sent two letters of intent to Mr. Slatery for her proposed purchase of Tri-State . . ."); Plaintiff never alleges that she made an actual offer to purchase Tri-State.

(quotation omitted).  When the motion to dismiss is decided on the basis of the pleadings (rather than on the basis of an evidentiary hearing), the plaintiff need make only a *prima facie* showing that jurisdiction exists.  *Porina v. Marward Shipping Co.*, 521 F.3d 122, 126 (2d Cir. 2008).

Personal jurisdiction of a federal court over a non-resident defendant is governed by the law of the state in which the court sits and by the limits of due process.  *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010).  Accordingly, the Court must engage in a "two-part analysis."  *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999).  The Court first looks to the long-arm statute of New York, the forum state.  *Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 208 (2d Cir. 2001).  If the exercise of jurisdiction is appropriate under New York's long-arm statute, the Court must then decide whether such an exercise comports with due process; a state may authorize personal jurisdiction over an out-of-state defendant only if "the defendant has certain minimum contacts with [the State] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice."  *Daimler AG v. Bauman*, 571 U.S. 117, 126 (2014) (cleaned up).

In deciding a motion to dismiss for lack of personal jurisdiction, the Court may consider materials outside the pleadings.  *See Jonas v. Est. of Leven*, 116 F. Supp. 3d 314, 323 (S.D.N.Y. 2015).  "The court assumes the verity of the allegations 'to the extent they are uncontroverted by the defendant's affidavits,'" *id.* (quoting *MacDermid*, 702 F.3d at 727), and construes the jurisdictional allegations in the light most favorable to the plaintiff, *A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 79–80 (2d Cir. 1993).  The Court need not accept either party's legal conclusions as true, nor will it draw "argumentative inferences" in either party's favor.  *See Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59 (2d Cir. 2012) (citation omitted).

A.     C.P.L.R. § 302(a)(1)

New York's long-arm statute provides for both general and specific jurisdiction.[4]

Pursuant to C.P.L.R. § 302(a)(1), a court may exercise specific jurisdiction over a non-domiciliary that "in person or through an agent . . . transacts any business within the state or contracts anywhere to supply goods or services in the state."  N.Y. C.P.L.R. § 302(a)(1).  "To establish personal jurisdiction under section 302(a)(1), two requirements must be met: (1) The defendant must have transacted business within the state; and (2) the claim asserted must arise from that business activity."  *Eades v. Kennedy, PC Law Offs.*, 799 F.3d 161, 168 (2d Cir. 2015) (quoting *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 168 (2d Cir. 2013)).  With respect to the "transacting business" part of the analysis, courts look to "the totality of the defendant's activities within the forum."  *Sterling Nat'l Bank & Tr. Co. of N.Y. v. Fidelity Mortg. Invs.*, 510 F.2d 870, 873 (2d Cir. 1975) (citations omitted).  The plaintiff's cause of action must also arise from defendants' transaction of business in the state, which requires "an articulable nexus, or a substantial relationship, between the claim asserted and the actions that occurred in New York."  *Henderson v. INS*, 157 F.3d 106, 123 (2d Cir. 1998) (cleaned up).

Section 302(a)(1) is a "single act statute," which means that "proof of one transaction in New York is sufficient to invoke jurisdiction."  *Deutsche Bank Sec., Inc. v. Mont. Bd. of Invs.*, 7 N.Y.3d 65, 71 (2006) (internal quotation marks and citation omitted).  The primary consideration is not the quantity but the quality of the contacts with New York.  *Fischbarg v. Doucet*, 9 N.Y.3d 375, 380 (2007).  Accordingly, "the purposeful creation of a continuing relationship with a New York corporation" supports the exercise of personal jurisdiction.  *Id.* at 381 (citations omitted). This is true "even [when] the defendant never enters New York" because "technological

---

[4]     Plaintiff argues only that Defendants WT Holdings and Slatery are subject to specific personal jurisdiction. *See* Am. Compl. ¶¶ 18–19, 26–27.

advances in communication . . . enable a party to transact enormous volumes of business within a state without physically entering it." *Deutsche Bank Sec., Inc.*, 7 N.Y.3d at 71.  Thus, New York courts have exercised "CPLR 302(a)(1) long-arm jurisdiction over commercial actors and investors using electronic and telephonic means to project themselves into New York to conduct business transactions." *Id.*

Nevertheless, communications with and payments to a New York resident, by themselves, are generally insufficient to establish personal jurisdiction.  *See, e.g.*, *Roper Starch Worldwide, Inc. v. Reymer & Assocs., Inc.*, 2 F. Supp. 2d 470, 475 (S.D.N.Y. 1998) ("merely sending payment to New York is not sufficient to establish personal jurisdiction over a defendant"); *Benefits by Design Corp. v. Contractor Mgmt. Servs., LLC*, 75 A.D.3d 826, 829 (3d Dep't 2010) ("[W]e do not find that the sole action of shipping a package of documents to New York, *without more*, demonstrates that the defendant availed itself of the privilege of conducting activities within the forum state.") (cleaned up) (emphasis added).  But such activities will suffice to establish personal jurisdiction "if they were related to some transaction that had its center of gravity inside New York, into which a defendant projected himself." *Three Five Compounds, Inc. v. Scram Techs., Inc.* No. 11-CV-1616, 2011 WL 5838697, at *4 (S.D.N.Y. Nov. 21, 2011) (citation omitted); *see also Liberatore v. Calvina*, 293 A.D.2d 217, 220 (1st Dep't 2001) (to confer personal jurisdiction, telephone calls and written communications "must be shown to have been 'used by the defendant to actively participate in business transactions in New York'") (citation omitted).

### 1.  **WT Holdings**

WT Holdings argues that it is not subject to personal jurisdiction in New York because (1) it is "not present (let alone 'at home') in New York nor does it transact a substantial part of its business in New York," as "[i]ts place of incorporation and principle place of business are not in New York, but in Tennessee"; (2) it "neither owns nor leases any real estate in New York; it holds no bank accounts in New York; and it owes no (and therefore pays no) taxes in New York"; and (3) it "has no employees or offices in New York, is not registered to do business in the state, and is not listed in any telephone, business, or other informational directory in the state." Defs. Mem. of Law, Dkt. 32 at 23–24.  WT Holdings further argues that Plaintiff's claim of personal jurisdiction over it depends solely on the company having communicated with and transmitted payments to Plaintiff in New York and that those contacts alone are insufficient to create a basis for personal jurisdiction. *Id.* at 24.[5]

In response, Plaintiff argues that "the center of gravity for all of the transactions at issue in this lawsuit is New York: (a) all of the agreements at issue relate to [Tri-State], which is a New York insurance company; and (b) all of the agreements designate New York as their governing law." Pl. Mem. of Law, Dkt. 33 at 26 (citations omitted).  Plaintiff further argues that "the Defendants projected themselves into New York for the purposes of transacting business, and affecting the ownership and operation of a New York insurance company (i.e., [Tri-State]), via all of the electronic and telephonic communications discussed in the Complaint." *Id.* (citing Am. Compl. ¶¶ 3–34, 44–123).  Finally, Plaintiff argues that "all of the false and fraudulent

---

[5]     Defendants also claim that Plaintiff alleges personal jurisdiction over WT Holdings based on WT Holdings' status as the parent company of Tri-State.  Defs. Mem. of Law at 24.  But neither Plaintiff's complaint nor her opposition to this motion presents such an argument. *See* Am. Compl. ¶¶ 18–25; Pl. Mem. of Law, Dkt. 33 at 23–26.

communications giving rise to Plaintiff's claims were directed to Ms. Hart—who Defendants knew was physically located in New York and a New York resident." *Id.*

WT Holdings' arguments against personal jurisdiction largely equate minimum contacts with minimum physical contacts, but that is not the law. *See Fischbarg*, 9 N.Y.3d at 382 ("It is well settled that 'one need not be physically present [here] . . . to be subject to the jurisdiction of our courts under CPLR 302'") (quoting *Parke-Bernet Galleries v. Franklyn*, 26 N.Y.2d 13, 17 (1970)). The focus must be on the business being transacted, not on Defendants' physical location. *See, e.g.*, *Deutsche Bank*, 7 N.Y.3d at 71–72. Although WT Holdings was not physically present in New York, it nevertheless projected itself into the state by purposefully conducting business related to a New York company, Tri-State, with Plaintiff, a New York resident.[6] WT Holdings did so through repeated, purposeful communications that were knowingly directed to Plaintiff. *See* Am. Compl. ¶¶ 56–57, 59–64, 69–74. That those communications were predominantly electronic does not change the result; a long line of New York precedent upholds the exercise of personal jurisdiction based on remote but purposeful contact. *See Fischbarg*, 9 N.Y.3d at 380 (finding out-of-state defendants subject to jurisdiction where they made a "purposeful attempt" to establish a relationship with a New York party and directly participated "in that relationship via calls, faxes, and e-mails that they projected into [New York] over many months"); *Ehrlich-Bober & Co. v. Univ. of Hous.*, 49 N.Y.2d 574, 577 (1980) (exercising long-arm jurisdiction over Texas defendant where most of the securities transactions at issue "arose out of telephone calls made to the plaintiff's New York office"); *Parke-Bernet Galleries*, 26 N.Y.2d at 17 (exercising personal jurisdiction under § 302 where

---

[6] The choice-of-law clause in Plaintiff's Severance Agreement, executed between the parties, even specifies: "This Agreement shall be governed by the laws of the State of New York applicable to contracts made and to be performed therein." *See* Slatery Decl. at Ex. C ¶ 20.

customer in Los Angeles called into an auction in New York City); *C. Mahendra (NY), LLC v. Nat'l Gold & Diamond Ctr., Inc.*, 125 A.D.3d 454, 457 (1st Dep't 2015) (holding that "parties' telephone dealings over several years and in the two transactions at issue" were sufficient to confer personal jurisdiction under § 302(a)(1)).[7]

WT Holdings insists that these cases are inapposite and that, because its contacts with New York were limited to its communications with and payments to Plaintiff, those contacts are insufficient to confer jurisdiction. *See* Defs. Reply Mem. of Law, Dkt. 34 at 9–10. Defendant's argument is meritless; its contacts related exclusively to a transaction with its "center of gravity" in New York — namely negotiations with Plaintiff, a New York resident, over her resignation and sale of shares purportedly in exchange for an opportunity to buy Tri-State, a New York company. Thus, there is personal jurisdiction over WT Holdings pursuant to C.P.L.R. § 302(a)(1).

## 2. Slatery

Slatery argues that the Court lacks personal jurisdiction because (1) he "is not a resident of New York, but rather of Tennessee"; (2) "[h]e does not own or lease any real property in New York, nor hold any bank accounts here"; (3) "[t]he only taxes Slatery has paid to New York tax authorities are the sales tax on personal retail items purchased during his infrequent trips here and tax on K-1 income (that is, income earned solely by virtue of being a shareholder of New

---

[7] The cases Defendants cite do nothing to counter this proposition, as they merely confirm that communications and the sending of documents and payment *alone* do not *necessarily* confer jurisdiction. *See, e.g.*, *Unlimited Care, Inc. v. Visiting Nurse Assoc. of E. Mass., Inc.*, 42 F. Supp. 2d 327, 331 (S.D.N.Y. 1999) ("The consensual (but not contractually required) mailing of payments to [Plaintiff] in New York, *standing alone*, does not convey jurisdiction.") (emphasis added) (citations omitted); *Benefits by Design Corp.*, 75 A.D.3d at 829 (finding that the shipment of documents may be sufficient to confer jurisdiction "if the defendant's activities . . . were purposeful and there is a substantial relationship between the transaction and the claim asserted") (citation omitted); *Epic Sports Int'l, Inc. v. Frost*, No. 651599/2012, 2013 WL 1783565, at *5 (Sup. Ct. N.Y. Cnty. Apr. 22, 2013) (telephone calls and sending correspondence to New York may be sufficient to confer personal jurisdiction where "such activities [are] shown to have been used by the defendant to actively participate in business transactions in New York.") (citation omitted).

York companies)"; (4) "[d]uring the last five years, Slatery has made no personal trips to New York, nor business trips to New York unrelated to Tri-State or other entities related to WT Holdings"; and (5) "he transacts no business here (whether in a personal or representative capacity) apart from business related to those entities."  Defs. Mem. of Law at 26 (citations omitted).

Here, too, Slatery equates minimum contacts with minimum physical contacts, and that is still not the law.  *See Fischbarg*, 9 N.Y.3d at 382.  Although Slatery was not physically present in New York, he nevertheless was personally involved in the allegedly tortious conduct at issue; he and those under his control made all of the allegedly false and fraudulent statements detailed in Plaintiff's complaint.  *See* Am. Compl. ¶¶ 4–34, 44–123.  Those statements were directed into New York, at a New York resident, and concerned Tri-State, a New York company.  Based on Slatery's alleged conduct, ramifications in New York were to be expected; his contacts were, therefore, sufficient to confer personal jurisdiction under C.P.L.R. § 302(a)(1).

Slatery further argues that, pursuant to the fiduciary shield doctrine, corporate employees like Slatery are "not subject to New York's 'long arm' personal jurisdiction if their contacts with the state are made in their corporate, rather than their personal, capacities."  Defs. Mem. of Law at 27 (citing *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 903 (2d Cir. 1981); *In re Terrorist Attacks on Sept. 11, 2001*, 718 F. Supp. 2d 456, 471 (S.D.N.Y. 2010)).  Plaintiff counters that "Slatery can be subjected to specific personal jurisdiction in a forum state, even if his only contacts with New York occurred in a corporate capacity."  Pl. Mem. of Law at 26 (citing, *inter alia*, *Retail Software Srvs., Inc. v. Lashlee*, 854 F.2d 18, 22 (2d Cir. 1988); *Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460 (1988)).

The fiduciary shield doctrine has been explicitly rejected both by the New York Court of Appeals and the Second Circuit for purposes of § 302.  *See Kreutter*, 71 N.Y.2d at 470 ("Turning then to the interpretation of CPLR § 302, we determine that it is neither necessary nor desirable to adopt the fiduciary shield doctrine in New York. . . . Nor is the rule necessary as a matter of fairness."); *Retail Software Servs.*, 854 F.2d at 22 (finding a corporate officer acting in a corporate capacity subject to New York's personal jurisdiction under *Kreutter*).  C.P.L.R. § 302 "does not distinguish actions taken in a defendant's personal capacity from actions taken in his 'corporate' capacity."  *Vega v. Hastens Bed, Inc.*, No. 21-CV-2732, 2021 WL 3854881, at *12 (S.D.N.Y. Aug. 28, 2021) (citations omitted); *see also Gilbert v. Indeed, Inc.*, 513 F. Supp. 3d 374, 411–12 (S.D.N.Y. Jan. 19, 2021) ("CPLR § 302 allows courts to exercise specific jurisdiction over corporate principals based on transactions made or acts taken in a corporate capacity.") (internal quotation marks and citation omitted).  Instead, C.P.L.R. § 302 "confers jurisdiction over individual corporate officers who supervise and control an [actionable] activity."  *Chloé*, 616 F.3d at 164 (citations omitted).  The relevant inquiry "turns on whether the corporate employee was the 'primary actor in the transaction in New York' or merely 'some corporate employee who played no part in' it."  *Advanced Video Techs. LLC v. HTC Corp.*, No. 11-CV-6604, 2019 WL 4198769, at *11 (S.D.N.Y. Aug. 12, 2019) (quoting *Retail Software Servs., Inc.*, 854 F.2d at 22).

Here, the fiduciary shield doctrine does not protect Slatery from jurisdiction under C.P.L.R. § 302(a)(1) because he was the primary actor, not some random corporate employee outside New York who played no part in the contacts with Plaintiff that give rise to this case.  *See* Am. Compl. ¶¶ 4–34, 44–123; *see also Wallace Church & Co. v. Wyattzier, LLC*, No. 20-CV-1914, 2020 WL 4369850, at *4 (S.D.N.Y. July 30, 2020) (finding personal jurisdiction under

§ 302(a)(1) over defendants who were the "primary actors" in the creation and negotiation of the contract underlying the action); *Kreutter*, 71 N.Y.2d at 470 (same).

Because Slatery transacted business in New York and Plaintiff's claims arise from that activity, personal jurisdiction exists pursuant to C.P.L.R. § 302(a)(1).

### B.    Due Process

Even if jurisdiction exists pursuant to New York's long arm statute, exercise of that jurisdiction must comport with Due Process.  The Due Process Clause requires as a predicate for the exercise of personal jurisdiction that the defendant have "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice."  *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotation marks omitted).  In evaluating whether a defendant has minimum contacts, the "crucial question is whether the defendant has purposefully availed itself of the privilege of conducting activities within the forum state" such that it "should reasonably anticipate being haled into court there."  *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 242–43 (2d Cir. 2007) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (alteration in original) (internal quotation marks omitted); *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).  "[A]s a practical matter, the Due Process Clause permits the exercise of jurisdiction in a broader range of circumstances than N.Y. C.P.L.R. § 302, and a foreign defendant meeting the standards of § 302 will satisfy the due process standard."  *Energy Brands Inc. v. Spiritual Brands, Inc.*, 571 F. Supp. 2d 458, 469 (S.D.N.Y. 2008) (citing *United States v. Montreal Tr. Co.,* 358 F.2d 239, 242 (2d Cir. 1966)).

Here, Defendants WT Holdings and Slatery have sufficient minimum contacts with New York so that exercising jurisdiction does not run afoul of the Due Process Clause.  They

purposefully conducted business with a New York resident, directing phone calls, correspondence, deal documents, and other communications to New York in order to transact business related to Tri-State, a New York company.  *See LaMarca v. Pak-Mor Mfg. Co.*, 95 N.Y.2d 210, 216–19 (2000) (finding non-domiciliary tortfeasor had minimum contacts with New York because the company "itself forged the ties with New York" through "purposeful [] action").  As with the long-arm analysis, the fact that these contacts were predominantly electronic does not change the result.  *See Burger King Corp.*, 71 U.S. at 476 ("So long as a commercial actor's efforts are 'purposefully directed' toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there."); *see also Travelers Health Ass'n v. Virginia ex rel. State Corp. Comm'n*, 339 U.S. 643, 647 (1950) (noting that minimum contacts exist "where business activities reach out beyond one state and create continuing relationships and obligations with citizens of another state"); *Deutsche Bank*, 7 N.Y.3d at 71 ("[T]he growth of national markets for commercial trade, as well as technological advances in communication, enable a party to transact enormous volumes of business within a state without physically entering it.").

New York has a strong interest in vindicating the rights of its citizens, and Plaintiff has a strong interest in obtaining relief here.  Defendants' burden, meanwhile, is relatively minimal.  "Considering that [Defendants'] long business arm extended to New York, it seems only fair to extend correspondingly the reach of New York's jurisdictional long-arm"; and exercising "jurisdiction . . . in New York would not offend traditional notions of fair play and substantial justice."  *LaMarca*, 95 N.Y.2d at 218–19.

In short, this Court has personal jurisdiction over both Defendants WT Holdings and Slatery.

## II.    Defendants' Motion to Dismiss for Failure to State a Claim

All Defendants move to dismiss the amended complaint pursuant to Rule 12(b)(6), arguing that Plaintiff has failed to allege adequately any of her five claims.  To survive a motion to dismiss under Rule 12(b)(6), "a complaint must allege sufficient facts, taken as true, to state a plausible claim for relief."  *Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 275 (2d Cir. 2013) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)).  "[A] complaint does not need to contain detailed or elaborate factual allegations, but only allegations sufficient to raise an entitlement to relief above the speculative level."  *Keiler v. Harlequin Enters., Ltd.*, 751 F.3d 64, 70 (2d Cir. 2014) (citation omitted).

The Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the light most favorable to the plaintiff.  *See Gibbons v. Malone*, 703 F.3d 595, 599 (2d Cir. 2013).  The Court is not required, however, "to accept as true a legal conclusion couched as a factual allegation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555).  "In considering a motion to dismiss, the Court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."  *Int'l Techs. Mktg., Inc. v. Verint Sys., Ltd.*, 157 F. Supp. 3d 352, 360 (S.D.N.Y. 2016) (citation and internal quotation marks omitted).

### A.    Count One: Section 10(b) of the Securities Exchange Act and Rule 10b–5

Count One of Plaintiff's complaint alleges that Defendants violated Section 10(b) of the Exchange Act and Rule 10b–5(b) promulgated thereunder.  *See* Am. Compl. ¶¶ 125–145.  Under Rule 10b–5(b), it is unlawful "to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any

security." 17 C.F.R. § 240.10b–5(b).  To state a claim, "a plaintiff must allege that the defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury."  *Emps.' Ret. Sys. of V.I. v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015).  Here, Defendants: (1) argue that Plaintiff's securities fraud claim must be dismissed for failure to plead fraud with particularity and (2) challenge the sufficiency of her allegations with respect to the first and fourth elements of the claim — material misstatements and reasonable reliance.

Before discussing Defendants' arguments, it is worth stating clearly what the Court understands Plaintiff's claim to be because, as pled, she includes statements in Count One that are either not well pled or are not statements of fact or appear to be factual.  The gist of the fraud claim is Defendants' statement that, if Plaintiff resigned and sold her stake in Tri-State, WT Holdings would consider in good faith an offer by Plaintiff to purchase Tri-State.  Those statements were false, according to Plaintiff, because at the time they were made, Defendants did not intend to consider in good faith any offer proposed by her.  While that may be very difficult to prove, it is an actionable fraud theory.  The balance of the statements included in Count One, however, are not actionable.[8]

---

[8]  Plaintiff includes in Count One Defendants' statements about what would happen if she declined to resign and sell her shares.  *See* Am. Compl. ¶ 129(d), (e); *see also id.* ¶¶ 64, 73, 163(d), (e).  Those statements might be threats, but Plaintiff does not adequately allege them to be false statements of fact.

###### 1.   Plaintiff pleads fraud with particularity

"Any complaint alleging securities fraud must satisfy the heightened pleading requirements of the [Private Securities Litigation Reform Act ("PSLRA")] and Fed. R. Civ. P. 9(b) by stating with particularity the circumstances constituting fraud." *ECA & Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009) (citations omitted).  "To satisfy the pleading standard for a misleading statement or omission under Rule 9(b), a complaint must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Blanford*, 794 F.3d at 305 (citation omitted).  Similarly, pursuant to the PSLRA, claims alleging violations of the Exchange Act "must specify 'the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *Id.* (quoting 15 U.S.C. § 78u–4(b)(1)(B)).

Defendants allege that Plaintiff's 10b–5 claims must be dismissed because "at a minimum, [Plaintiff] does not 'specify the statements that [she] contends were fraudulent,' nor specifically where or when each statement was made.  At most, Hart provides generalized descriptions of Defendants' alleged misrepresentations."  Defs. Mem. of Law at 18–19.  That is simply not so; Plaintiff alleges with particularity statements — indicating where, when, and by whom each was made — by Defendants that Plaintiff alleges were false statements of fact on which she relied when selling her shares in Tri-State.  *See* Am. Compl. ¶¶ 56–95, 129-132, 163. Plaintiff further alleges facts from which the Court can infer, barely, that those statements were false when made.  *Id.* ¶¶ 86–95, 130–35, 142–43, 164, 167.  Thus, Plaintiff has pled her securities fraud claim with particularity.

### 2.     Plaintiff asserts actionable misrepresentations

To plausibly allege a misstatement or omission of material fact, the plaintiff must plead that a statement of fact by defendants was false or misleading at the time the statement was made. *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014) ("A violation of Section 10(b) and Rule 10b–5 premised on misstatements cannot occur unless an alleged material misstatement was false at the time it was made.") (citation omitted), *aff'd*, 604 F. App'x 62 (2d Cir. 2015).  Under the PSLRA and Rule 9(b) pleading requirements, the plaintiff must explain with particularity why the statement of fact was false and the basis for the plaintiff's belief that it was false at the time that it was made. *Id.*

"The materiality of a misstatement depends on whether there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to act." *ECA & Local 134 IBEW Joint Pension Tr. of Chicago,* 553 F.3d at 197 (cleaned up).  "To be material, a statement must, in the view of a reasonable investor, have significantly altered the total mix of information made available." *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S,* 11 F.4th 90, 100–101 (2d Cir. 2021) (cleaned up). At bottom, a fact is material "if there is a substantial likelihood that a reasonable person would consider it important in deciding whether to buy or sell shares of stock." *Operating Loc. 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92–93 (2d Cir. 2010) (citation omitted).

Defendants argue that the statements Plaintiff claims are false are actually "declarations of future intent—specifically, to negotiate a potential sale of Tri-State—and are not guarantees or statements of present fact." Defs. Mem. of Law at 17.  They insist that, although Plaintiff alleges that "Defendants specifically told Ms. Hart that she had a bona fide opportunity to purchase Tri-State in good faith," *id.* (quoting Am. Compl. ¶ 133), this is "hardly a 'guarantee' of performance

or an outcome . . . and not a statement of present fact regarding 'something to be done'"; thus,

"the statements Hart alleges in support of her Rule 10b–5 claim are not actionable," *id.* (citation

omitted).

Plaintiff argues that Defendants' statements to "Plaintiff that she would have a bona fide

opportunity to purchase [Tri-State] if she (i) resigned her position, (ii) sold back her shares on

the price and terms they demanded, and (iii) submitted an offer that matched the key terms under

which Defendant would sell [Tri-State]" are actionable because "Defendant knew that those

representations were false at the time they were made."  Pl. Mem. of Law at 12 (citing Am.

Compl. ¶ 51–100, 129–44, 163–70).  Defendants' statements were "not opinions, statements of

hope, or belief about future performance, expectations or projections," but rather "knowingly

false misrepresentations of existing fact when made."  *Id.*

The Court agrees with Plaintiff that the Complaint plausibly, albeit barely, alleges that, at

the time Defendants told her that if she resigned and sold her shares they would consider in good

faith an offer from her to purchase Tri-State, they had no intention of considering in good faith

any offer from her, rendering their statements false statements of fact.[9]  *See* Am. Compl. ¶¶ 56–

95, 129–35, 142–43,163–64, 167.

The factual allegations supporting Plaintiff's claim are largely conclusory.  *See, e.g.*, *id.*

¶¶ 87 –95, 130.  Nevertheless, Plaintiff alleges enough circumstantial evidence to nudge her

allegation that Defendants never intended to consider in good faith any offer from her to

purchase Tri-State across the line from possible to plausible.  Those circumstantial allegations

---

[9]     The Court agrees with Defendants that they were not guaranteeing to Plaintiff that her offer would be
accepted.  Thus, while the fact that they did not actually accept her offer — if she ever actually made one — may be
circumstantial evidence that Defendants never intended to accept an offer from her, standing alone their failure to
accept Plaintiff's offer does not prove that their prior statements were false.

include: (i) that her offer was not, in fact, presented to the Board,[10] even though it was as favorable as prior offers Defendants wanted to accept and more favorable than the Stillwater offer;[11] and (ii) a number of allegations from which the Court can infer that Slatery had a personal financial interest in insuring that Tri-State was not separated from WT Holdings. *Id.* ¶¶ 83–85, 103–22. Neither is conclusive, but construing the allegations in the light most favorable to Plaintiff, they are sufficient for the Court to infer that Defendants never intended to consider any offer made by Plaintiff.

In short, Plaintiff has barely asserted actionable misrepresentations by Defendants.

### 3. Plaintiff adequately pleads reliance

To state a cause of action under Section 10(b) and Rule 10b–5, a plaintiff must also adequately plead that it reasonably relied on defendants' alleged misrepresentations or omissions. *See Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 159 (2008) (reliance by the plaintiff upon the defendant's allegedly deceptive statements or acts "is an essential element of the § 10(b) private cause of action"). In determining the reasonableness of Plaintiff's reliance, courts must consider "the entire context of the transaction, including . . . its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them." *Crigger v. Fahnestock & Co.*, 443 F.3d 230, 235 (2d Cir. 2006)

---

[10]     This allegation was made on information and belief and Plaintiff includes no facts from which the Court can infer the basis for her belief, meaning that the Court could have ignored this allegation entirely. *See Luce v. Edelstein*, 802 F.2d 49, 54 n.1 (2d Cir. 1986) ("Allegations of fraud cannot ordinarily be based 'upon information and belief' except as to 'matters peculiarly within the opposing party's knowledge.") (citation omitted). The Court finds, however, that facts related to this allegation — that Defendants never presented Plaintiff's offer to the Tri-State Board — are peculiarly within Defendants' knowledge, as Plaintiff's letters of intent were sent after she was no longer a director or stockholder of Tri-State, and, thus, she would not have been privy to how they were received or handled.

[11]     Like the allegation regarding Plaintiff's offer not being presented to the Tri-State Board, the assertion that her offer was more favorable than Stillwater's was also made on information and belief with no factual explanation why Plaintiff believes her offer was superior to Stillwater's. For the same reason the Court will consider the allegations about the handling of her offer, it will also consider, for purposes of the motion to dismiss, the relative merits of Plaintiff's and Stillwater's offers.

(citation omitted).  "The reasonableness of a plaintiff's reliance is a 'nettlesome' and 'fact intensive' question, and thus 'is often a question of fact for the jury rather than a question of law for the court.'"  *FIH, LLC v. Found. Cap. Partners LLC*, 920 F.3d 134, 141 (2d Cir. 2019) (citations omitted).

Defendants argue that Plaintiff cannot prove reasonable reliance because the Stock Transfer Agreement and the Severance Agreement both contain a general release[12] and a merger clause[13] that preclude Plaintiff from proving that she reasonably relied on statements made by Defendants prior to her signing those agreements.  Defs. Mem. of Law at 12–13, 15.  Defendants further argue that Plaintiff "consult[ed] with counsel regarding the legal consequences of selling her stock" and "[t]here can be no reliance on a statement where [Plaintiff] either could have or did consult with counsel in connection with the subject matter at issue."  *Id.* at 16.

Although the Court has grave reservations that Plaintiff will be able to prove reasonable reliance, neither the general release nor the merger clause, as a matter of law, preclude her from trying.

Starting with the general release, the law is quite clear that section 29(a) of the Exchange Act[14] generally invalidates blanket releases of liability that accompany the purchase or sale of securities.  *See Pasternack v. Shrader*, 863 F.3d 162, 171 (2d Cir. 2017).  Putting aside that problem with Defendants' argument, "[courts] do not give effect to contractual language . . . purporting to be a general waiver or release of securities-fraud liability altogether" as "[t]he statutory framework of the 1933 and 1934 Acts compels the conclusion that individual

---

[12]     Slatery Decl. Ex. B (Stock Transfer Agreement) ¶ 3; *id.* at Ex. C (Severance Agreement) ¶ 2.

[13]     *Id.* at Ex. B (Stock Transfer Agreement) ¶ 7; *id.* at Ex. C (Severance Agreement) ¶ 16.

[14]     Section 29(a) of the Exchange Act, provides "[a]ny condition, stipulation, or provision binding any person to waive compliance with any provision of this chapter or of any rule or regulation thereunder . . . shall be void."  15 U.S.C. § 78cc(a).

securityholders may not be forced to forego their rights under the federal securities laws due to a contract provision." *Id.* (cleaned up).

Defendants' argument based on the merger clause does not run afoul of a statutory prohibition, and it may be much more persuasive at the summary judgment stage than their argument based on the releases, but it still is not sufficient to prevail at this stage of the litigation. Plaintiff was a sophisticated insider who was represented by counsel so, to the extent she was truly relying on Defendants' representations that they would consider in good faith her offer to purchase Tri-State if she first resigned and sold her shares, one would have thought that she would have included that representation in the Stock Transfer Agreement. *See*, *e.g.*, *Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp.*, 343 F.3d 189, 196 (2d Cir. 2003) ("having been told [a particular fact], Emergent should have protected itself by insisting that this representation be included in the stock purchase agreement.  Given [seller's] extensive contractual representations about other matters, [Emergent's] sophistication, and the size of the transaction, Emergent's failure to do so precludes as a matter of law a finding of reasonable reliance upon [seller's] representations about [the particular fact]").  But, as was the case in *FIH*, there is no explicit language in the merger clause disclaiming reliance on prior oral representations.  Thus, although the Plaintiff may have a difficult row to hoe to prevail on her claim that her reliance was reasonable, given the motion to dismiss standard, the Court will allow her to try.

> **B.     Count Two: Section 20(a) of the Securities Exchange Act**

Slatery claims also to challenge the adequacy of Count Two, which asserts control person liability against Slatery pursuant to Section 20(a) of the Securities Exchange Act.  That motion is denied because Defendant made no real argument in support of it,[15] likely believing (correctly)

---

[15]     Defendants mention Section 20(a) only twice in their motion to dismiss (and not at all in their reply), both times to recite Plaintiff's allegations and the evidence Plaintiff marshalled in support of them.  *See* Defs. Mem of

that if Count One were dismissed, as it urged, Count Two would also be dismissed, *see, e.g.*, *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 637 (S.D.N.Y. 2007) ("control-person liability exists only where there is a primary violation").  Because, however, the Court has denied Defendants' motion to dismiss Count One, and because Slatery has not explained why Count Two fails to state a claim, Slatery's motion to dismiss Count Two is also denied.

### C.    Count Three: Fraudulent Inducement

Count Three alleges that Defendants committed fraudulent inducement by making "known material misrepresentations and omissions of material fact to induce Plaintiff to execute agreements resigning her employment, to sell her ownership interests, and to surrender her contractual and statutory rights arising therefrom."  Am. Compl. ¶ 162.  Under New York law, "[a] claim for fraudulent inducement must satisfy the same elements as a claim for common law fraud."  *Ithaca Cap. Invs. I S.A. v. Trump Pan. Hotel Mgmt. LLC*, 450 F. Supp. 3d 358, 369 (S.D.N.Y. 2020); *see also Friar v. Wyndham Vacation Resorts, Inc.*, No. 20-CV-2627, 2021 WL 1062615, at *4 (S.D.N.Y. Mar. 19, 2021) ("the elements for fraud and fraudulent inducement are effectively the same").  To state a claim for fraudulent inducement, Plaintiff must allege facts from which the Court can infer that "the defendant . . . made a misrepresentation of a material fact, that was known to be false and intended to be relied on when made, and that plaintiff justifiably relied on that misrepresentation to its injury."  *Amida Cap. Mgmt. II, LLC v. Cerberus Cap. Mgmt., L.P.*, 669 F. Supp. 2d 430, 444 (S.D.N.Y. 2009) (citation omitted).

---

Law at 8 ("In support of her Rule 10b-5, Section 20(a), and fraudulent inducement claims, Plaintiff alleges that Defendants made material misrepresentations (consisting of both affirmative misstatements and omissions) related to the sale of her Tri-State stock to induce Plaintiff to resign and sell her three percent ownership interest in Tri-State at less than fair market value . . ."); *id.* at 9 ("In support of her claim against Slatery under Section 20(a), Plaintiff alleges that Slatery made the aforementioned alleged misrepresentations and omissions in furtherance of the fraud relating to her divestiture of her positions and ownership interest in Tri-State.") (citing Am. Compl. ¶¶ 154-55).

For the same reason that Defendants' motion to dismiss Count One is denied, so too is their motion to dismiss Count Three.

### D.      Count Four: Economic Duress

Count Four of Plaintiff's complaint alleges that Defendants subjected Plaintiff to economic duress by telling her that she must resign her positions as President and CEO of Tri-State or be fired in order to pressure Plaintiff into giving up her rights as a shareholder and officer of the company.  Am. Compl. ¶¶ 174–81.  Under New York law, a "party seeking to avoid a contract because of economic duress shoulders a heavy burden." *Nasik Breeding & Rsch. Farm Ltd. v. Merck & Co.*, 165 F. Supp. 2d 514, 527 (S.D.N.Y. 2001) (citation omitted); *see also VKK Corp. v. Nat'l Football League*, 244 F.3d 114, 123 (2d Cir. 2001) ("[T]he ability of a party to disown his obligations on [the basis of economic duress] is reserved for extreme and extraordinary cases.").

To state a claim for economic duress, Plaintiff must allege facts from which the Court can infer that the contract at issue "was secured (1) by means of wrongful threat precluding the exercise of free will; (2) under the press of financial circumstances; (3) where circumstances permitted no other alternative." *Oquendo v. CCC Terek*, 111 F. Supp. 3d 389, 407–08 (S.D.N.Y. 2015) (cleaned up); *accord Kamerman v. Steinberg*, 891 F.2d 424, 431 (2d Cir. 1989).  "A contract or release, the execution of which is induced by duress, is voidable." *DiRose v. PK Mgmt. Corp.*, 691 F.2d 628, 633 (2d Cir. 1982).  But evidence "of financial pressure or unequal bargaining power" is not, by itself, enough to constitute economic duress. *Interpharm, Inc. v. Wells Fargo Bank, N.A.*, 655 F.3d 136, 142 (2d Cir. 2011).  Further, "the person claiming duress must act promptly to repudiate the contract or release or . . . be deemed to have waived [the] right to do so." *VKK*, 244 F.3d at 122–23; *DiRose*, 691 F.2d at 633–34 (same).

Defendants argue that Plaintiff has failed to state a claim for economic duress because: (1) she has "failed to allege that there was 'involuntary acceptance of contract terms,'"; (2) she does not allege any unlawful threats; (3) her allegations "do not establish that the circumstances permitted no alternative or that defendants' actions deprived her of free will"; and (4) she did not return the benefits of the Stock Transfer Agreement and Severance Agreement.  Defs. Mem. of Law at 19–20.  Without even considering Defendants' first three arguments, Plaintiff's economic duress claim fails as a matter of law because she has alleged no facts from which this Court can infer that she repudiated either the Stock Transfer Agreement or the Severance Agreement, or that she returned the money she received in consideration for either.  Accordingly, Plaintiff is "deemed to have ratified the [agreements] and is thereby barred from challenging [their] validity."  *Smith v. JPMorgan Chase*, 15-CV-808, 2016 WL 5339548, at *9 (S.D.N.Y. Sept. 23, 2016) (citation omitted); *see also Westbrooke v. Bellevue Hosp. Ctr.*, No. 16-CV-9845, 2019 WL 233611, at *3 (S.D.N.Y. Jan. 16, 2019) (finding plaintiff's claim of economic duress "futile because she has alleged no basis for the Court to find that she repudiated the Agreement").

Because Plaintiff has waived her right to claim economic duress, Defendants' motion to dismiss Count Four is granted.

### E.     Count Five: Breach of Contract

Count Five of Plaintiff's complaint alleges that Defendants "breached the [August 2010] Shareholder Agreement and its implied covenant of good faith and fair dealing by engaging in a course of conduct that was designed to induce Plaintiff into resigning her positions with the company and selling her three percent (3%) interest in the company for far less than fair market value, all for the purpose of preventing Plaintiff from exercising her substantive rights" as a shareholder.  Am. Compl. ¶ 191.  Under New York law, an implied covenant of good faith and

fair dealing is implicit in every contract, *Spinelli v. Nat'l Football League*, 903 F.3d 185, 205 (2d

Cir. 2018); it "encompasses any promises which a reasonable person in the position of the

promisee would be justified in understanding were included, and it prohibits either party from

acting in a manner which will have the effect of destroying or injuring the right of the other party

to receive the fruits of the contract." *Granite Partners, L.P. v. Bear, Stearns & Co. Inc.*, 17 F.

Supp. 2d 275, 305 (S.D.N.Y. 1998) (cleaned up); *see also Fishoff v. Coty Inc.*, 634 F.3d 647, 653

(2d Cir. 2011) ("Where the contract contemplates the exercise of discretion, this pledge includes

a promise not to act arbitrarily or irrationally in exercising that discretion.") (citations omitted).

Although the covenant inheres in every contract, "[t]he scope of potential liability for

breach of the covenant is quite narrow," *Witherspoon v. Rappaport*, 65 F. App'x 356, 359 (2d

Cir. 2003); it is not implicated merely because a party acts in its own interests in a way that may

incidentally lessen "the other party's anticipated fruits from the contract," *M/A-COM Sec. Corp.

v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990) (citation omitted).  To prove breach of an implied

covenant of good faith and fair dealing, a plaintiff "must provide facts which tend to show that

[the defendant] sought to prevent performance of the contract or to withhold its benefits from

[the plaintiff]." *CIT Bank, N.A. v. Nwanganga*, 328 F. Supp. 3d 189, 200 (S.D.N.Y. 2018)

(cleaned up).  Put differently, "[i]n order to find a breach of the implied covenant, a party's

action must directly violate an obligation that may be presumed to have been intended by the

parties." *Gaia House Mezz LLC v. State St. Bank & Tr. Co.*, 720 F.3d 84, 93 (2d Cir. 2013)

(internal quotation marks omitted).

Defendants argue that Plaintiff's claim fails because: (1) it is barred by the general

releases and integration clauses in the Stock Transfer Agreement and the Severance Agreement;

and (2) it contradicts express terms of the August 2010 Shareholder Agreement, namely Section

10(j), which provides that "any of the terms or conditions of this Agreement may be waived in writing at any time by the party hereto which is entitled to the benefit thereof."  Defs. Mem. of Law at 21–22.

Plaintiff counters that she "is well within her rights to claim, at least in the alternative, if not primarily, that the Shareholder Agreement was never supplanted by the Stock Transfer Agreement (including the release therein)" because the Stock Transfer Agreement "was the result of Defendants' fraudulent inducement, which renders the contract voidable and provides Ms. Hart the option to rescind the contract."  Pl. Mem. of Law at 23 (citing *Malone v. Gimpel*, 151 F. Supp. 549, 554 (N.D.N.Y 1956)).  But, as Defendants point out, "that is *not* what Hart pleads in her breach-of-contract count in the Amended Complaint: she nowhere asks for rescission, but rather an award of damages based on Defendants' alleged breach of the implied covenant of good faith and fair dealing."  Defs. Reply Mem. of Law at 8 (emphasis in original); *see also* Am. Compl. ¶ 192 ("As a result of the Defendants' breach of the Shareholder Agreement and its implied covenant of good faith and fair dealing, Ms. Hart has been damaged in an amount to be proven at trial based on an independent, fair-market valuation of Tri-State as of November 30, 2020, which upon information and belief, will show that Plaintiff has suffered damages of not less than $1,750,000.00.").  Because Plaintiff attempts to move the goalpost rather than defend her claim as brought, Defendants' motion to dismiss Count Five is granted.

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part Defendants' motion to dismiss.  The Clerk of Court is respectfully directed to close the open motion at docket entry 29.

**SO ORDERED.**

**Date:   November 6, 2021**
      **New York, New York**

**VALERIE CAPRONI**
**United States District Judge**